And we'll turn to the final two cases on our calendar, Moment of Performance Materials. What does BOKF stand for? Bank of Oklahoma. And I actually don't know what the F stands for, Judge Pooler. Oh, I could guess. Financial institution, perhaps? I actually do not know what the F stands for. Okay, thank you. My pleasure, Judge Pooler. May it please the Court, Philip Anker, Wilmer Hale, on behalf of Bank of Oklahoma, I want to address both of the key issues on appeal, the interest rate on the replacement notes and the disallowance of the Maykull claim. Let me start with the interest rate. In bankruptcy, unsecured creditors often, typically, are not paid in full. But secured creditors, as a matter of statute, are treated differently. They are entitled, unless they consent otherwise, to be paid every penny they are owed. I submit the plan here violated that rule, and as a result, as we cited in our brief, it has ignited an extraordinary firestorm in the lending community. Even without consideration of the Maykull, my clients loaned $1.1 billion. There's no dispute they were owed that amount of money. Rather than pay them that amount of money in cash at confirmation, the plan gave them notes where that $1.1 billion would only be paid seven years later, and it provided for interest in the interim, as it had to. But the bankruptcy court said that interest rate could, indeed, absolutely, as a matter of law had to be, less than what the market would require to value that note as worth the full amount paid. And that's the nature of the error that the bankruptcy court made? That is the nature of the error. That's exactly the nature of the error, Judge Kuhler. Tell me the rule you think should have been applied. I submit the rule, Judge Parker, is exactly the rule of the Sixth Circuit. The Sixth Circuit, in the American Home Patients case, said the following. This means that the market rate should be applied in Chapter 11 cases where there exists an efficient market, but where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the till plurality. How do we know an efficient market when we see it? How do I know it existed here? Both here and generally. In general, that's a determination for a bankruptcy court to make in the first sentence, which would come up to this court, if at all. But what is an efficient market? An efficient market is a market where there's a debtor who has market weight and market strength. This was not a consumer. This was a multibillion-dollar company represented by a Wall Street law firm with one of the leading investment banks in the country who sought to get the best rate possible, having gone to not only three of the world's largest lenders, Chase, Citi, and Credit Suisse, but having gone to its own equity sponsor, Apollo, which has $25 billion in liquid assets. It negotiated. In the words of its own expert, it had a, quote, broad marketing process that was competitive that led to the best available rate following, and I quote, virtually nonstop multi-track negotiations. Not every case will have that kind of world in it. This is an extraordinary case, and the proof is in the pudding. These debtors filed with the Securities and Exchange Commission as they had to, disclosures, and they listed the liability to my company under penalty of SEC rules as not $1.1 billion but $957 million. They disclosed the liability of the one-and-a-half lenders not at $250 million but $202. Whether there is or is not an efficient market in some hypothetical case is a question to be decided in the future, Judge Parker, but it's whether there's competition. Let me tell you what I'm concerned about here, and please have you give me whatever help you can. Let's assume hypothetically that this is an outlier where you have a powerful body of evidence pointing toward the existence of a market. We haven't really spoken on this yet, and bankruptcy judges throughout this circuit are going to be looking at Chapter 11 cases. I remember in the antitrust context when there used to be antitrust cases, the exercise of constructing and describing the market was extensive and technical. It was expensive with expert witnesses, economists, and so forth. How are we going to spare the chaos that this might cause bankruptcy? Your Honor, I'm a bankruptcy litigator. I do it every day, and I do it, frankly, in the large Chapter 11 cases. This is what bankruptcy judges do for a living, valuation. Valuation is what I spend every day doing more than anything. It comes up in the one-in-a-hundred case. I don't do the Chapter 11 case of the drugstore or the restaurant that is getting to be reorganized. This is a rule that will apply where you have truly competing parties of equal economic power and weight coming at each other. I do not ask this Court to define what is and is not an efficient market. That seems to me, Judge Parker, something to be done over time. If I could make one more point on this, and then I know my time is up. I don't know if you want me to turn to the May call. I'd love to have a minute. I see the answer is no. Judge Kipranos, I'll save it for rebuttal or let Mr. Parker. If you look at Till, I would ask this Court, more than anything, to look at Section 5 of the Roman V of the opinion, where the court, the plurality, takes on Justice Scalia's dissent. And what the plurality in Justice Stevens' opinion says is the market for subprime loans is anything but competitive, and it can lead to, and this is a direct quote, rates that are greater than what a competitive market would allow. Why, if the Supreme Court was saying the rule of law is always to apply a formula rate and never apply a competitive rate where it's a competitive Chapter 11, why did the plurality take on the dissent on that very issue? I submit that was the decisive issue in that case. I urge this Court to not create a split with the Sixth Circuit and the Fifth. I urge this Court to adopt exactly the rule of law the Sixth adopted. Thank you. You reserve one minute, Mr. Anacostia. Mr. Hallward-Driemeier. Doug Hallward-Driemeier for Wilmington Trust. If I may take up from where Ms. Dranker left off, the statute 1129B2A provides that where an over-secured creditor, such as our clients, are not receiving cash, they may receive a stream of payment, but that stream of payment must have a value as of the effective date, which means the present value of at least the value of the allowed claim. That means they were entitled either to $250 million in cash or a stream of payments worth a present value of $250 million. By the debtors' own acknowledgment in their 10-Qs published at the end of September under Fresh Start Accounting, they said those notes were worth $202 million, a discount of 18%. That was not a surprise. That was not something that could not have been foretold. Our expert in the Kearns report, and this is in the CLJA at 07, said, quote, the market value of the replacement one-and-a-half lien notes on the assumed effective date as contemplated in the plan would be 82% of their face value, exactly what transpired, because effectively this is math. When we know the market rate, we can do the discounting. And that is what the House report said that accompanied 1129B2A. We cite the Callier's discussion of it, citing it in our brief at pages 20 to 21. If the note bears a market rate of interest, the market will discount the note at the same rate, and the present value of the note will be the face amount. Tell me the rule that you are urging on us, and you can short-circuit if it's any different from what Mr. Anker told me. No, it is the same as Mr. Anker. We emphasize that, and this is an easy case. If there's an efficient market, let it set the rate. If there's not, go to the formula and let the bankruptcy judge decide which are the two. That's right. But what Judge Drain did was categorically reject the relevance of an efficient market because he determined that in any efficient market there would be some profit, and he believed that all profit must be extracted from the rate. But what profit refers to in Till and in Valenti is not the rate that will produce a par value, a present value equal to the face value. The profit that Till and Valenti refer to is the above-par rate that an inefficient market generates. And they were talking in Till of 21 percent, in Valenti of 15.7 percent, near the usury statute prohibitions, not the rate that was produced by a broker that was, you know, first in class. On the view of the bankruptcy court, the broker that was paid millions of dollars to negotiate this highly competitive back-and-forth between two equally sophisticated parties produced a rate in the open market that had $200 million of extra profit in it for the lenders. That's the combination of the extra profit that's revealed by the 10 Qs. Could you just tell me how it would work? The bankruptcy court will hold a hearing, bring in its own experts, or have the parties present experts and make an opinion about whether there's an efficient market, and if so, what the interest rate is? Well, Your Honor, we think that we've proposed that at the very least, where there is an efficient market rate that's readily identifiable, the court should have to use that. And that's what we have here, because we had the exit financing that was negotiated at precisely the same time. What the court has done is adopted a categorical rule the other way. We think that at the very least, where that rate is available, the court needs to utilize it. If I may just very quickly, on the make-all, I point out that the other side wants to have all the benefits of the contract, but not to allow our clients the benefit of their rights under the contract. That is not permitted in bankruptcy. Thank you. Now, we have a scheduling problem, which is not your problem. It's our problem. So, at the risk of doing something unusual, we're going to recess for a few minutes, and then we're going to come back and hear another case with another panel, where the judge is available only during a certain period of time. And when that is done, which hopefully will be 20 minutes or so, 30 minutes, then we will have the benefit of Mr. Shah's argument and the other argument as well. And there's another case, too, with the same parties. Yes, of course. Yes, of course. All right. And we will hear the other case then also. We're in recess.